JUNE GARMISA, Plaintiff-Appellant, *v.* LEONARD GARMISA, Defendant-Appellee and Cross-Appellant.

(No. 55356;

First District—January 28, 1972.

*Rehearing denied March 28, 1972.*

Jerome Berkson, of Chicago, for appellant.

Altheimer, Gray, Naiburg & Strassburger, and Rinella & Rinella, both of Chicago, (Alan J. Altheimer, Lionel G. Gross, Norman M. Gold, Kenneth R. Gaines, and Owen Doss, of counsel,) for appellee and cross-appellant.

Mr. JUSTICE DRUCKER delivered the opinion of the court as modified on the denial of plaintiff's petition for a rehearing:

Plaintiff appeals from a judgment partially vacating a decree of divorce incorporating a property settlement agreement and modifying said decree by reinstating plaintiff's right to apply for alimony which had been waived in the settlement agreement. Defendant has filed a cross-appeal. Plaintiff filed this action under Section 72 of the Civil Practice Act. Ill. Rev. Stat. 1969, ch. 110, par. 72.

On appeal plaintiff contends (1) that the court had no jurisdiction to merely modify the decree as it related to the property settlement after it found defendant guilty of fraud in its procurement; (2) that the court erred in refusing to vacate all parts of the decree relating to property settlement after it found fraud; (3) that the court erred in finding that defendant was entitled to a writ of restitution after it found fraud; and (4) that as a matter of law plaintiff was subject to duress when she executed the property settlement.

In his cross-appeal defendant contends that the court erred in finding him guilty of fraud and seeks reinstatement of the property settlement in its entirety.

Plaintiff and defendant were divorced on February 11, 1969. The divorce decree incorporated a property settlement executed by the parties on February 7, 1969. The marriage had lasted for two years. It was the second marriage for each and no children were born of it.

On July 14, 1969, defendant (then the plaintiff) filed an action under the Forcible Entry and Detainer Act, Ill. Rev. Stat. 1969, ch. 57, par. 1, et seq., seeking to evict plaintiff (defendant in that action) from their former marital home, alleging that under the terms of the property settlement plaintiff was to have vacated the home on or before June 30, 1969.

On July 31, 1969, plaintiff filed a petition under Section 72 of the Civil Practice Act to vacate the decree approving and incorporating the property settlement. The petition alleged that plaintiff was subject to duress when she executed the settlement and that it was procured through fraud in that defendant misrepresented the value of his business assets at the time the parties were negotiating their property settlement. The alleged result of said misrepresentation was that plaintiff entered into a settlement under which she waived any right to alimony which she would not have done and accepted less money than she otherwise would have agreed to receive.[1]

The forcible entry and detainer action and the Section 72 proceeding were consolidated and a hearing was held. Over the course of about five months the court heard 800 pages of testimony. It is significant to note which events occurred before the entry of the divorce decree on February 11, 1969, and those which occurred thereafter. Our resume of the relevant testimony will be divided along those lines.

Defendant was called to testify by plaintiff under Section 60 of the Civil Practice Act. For many years he had been the controlling shareholder of Garmisa Distributing Company, a record distributor for American Broadcasting Company (hereinafter ABC). Defendant's other relevant business interests consisted of an 85% ownership interest in John Roberts Company (hereinafter John Roberts), a partnership, and a 16⅔% interest in Selected Tape and Record Company (hereinafter Selected Tape), also a partnership. The bulk of John Roberts' business came from being the exclusive purchasing representative for Sears Roebuck for most of the independent record labels. It operated on a year to year contract with Sears. (As established by other testimony the book value of defendant's equity interest in John Roberts as of December 31, 1968, was $124,640.) Selected Tape was formed in 1967. It distributed tape cassettes. Defendant purchased his 16⅔% interest therein for $7500 in September 1968. Harry Beckerman, defendant's partner, owned the controlling interest in Selected Tape and handled the two large accounts that the company depended upon for success. (As established by other testimony, the book value of defendant's equity interest in Selected Tape as of December 31, 1968, was $9183.)

Garmisa Distributing Company began losing its profitability in 1967.

---

[1] The main terms of the settlement were that defendant give plaintiff $40,000; that plaintiff quit-claim her interest in the marital home, title to which had been held in joint tenancy but for the purchase of which defendant had supplied all the consideration; that plaintiff vacate the marital home on or before June 30, 1969; and that plaintiff waive any right to alimony and interest in defendant's estate which she may have had due to the marital relationship.

In October 1968 defendant went to New York to discuss his business problems with ABC. He told Larry Newton, president of ABC records, that he would like to get out of the distributing business. Newton said, "Well, okay, if that's what you want. I think we can get you out." Just before defendant left Newton's office Newton told him, "I am going to buy your company." Defendant said, "Buy what companies? You don't even know what my companies are." Newton said, "I am going to buy your company. I am going to give you two million dollars." Defendant responded, "You are out of your skull. Do you know what you are talking about?"

Between October 1968 and January 1969 defendant talked to Newton by telephone five or six times but in none of these conversations did Newton mention the possibility of buying defendant's companies. Defendant next met with Newton on January 2 or 3, 1969, at a Florida meeting attended by ABC's record distributors. Defendant again requested that Newton get him out of the distributing business; that he had not made any money with ABC for two years.

The next day there was further discussion about the acquisition of defendant's companies. Defendant told ABC that it "would probably be difficult" to work for Larry Newton. He stated that:

"They [ABC] had no real idea what Selected Tape and Record did. They weren't sure of John Roberts. * * * We talked * * * about various things, on how to acquire my companies. * * * [I] could never * * * tell them anything concrete * * * they knew and I knew that there was no way that I could sell John Roberts Company without the Okay of Sears Roebuck and there was no way we could sell Selected Tape and Record without Goodyear and Western Auto's permission."

Employment of defendant by ABC was discussed. Defendant told them that he would probably be a lot more interested in selling if he didn't have to work for ABC. "[T]hey laughed; it was out of the question." Harry Beckerman's role was discussed:

"They were under the belief that Mr. Beckerman was a fairly minor employee there. He happened to be not. * * * They were very much surprised. They were not interested in one without the other. They were not interested in * * * [John Roberts] without Selected Tape. * * * [I] couldn't talk for Mr. Beckerman."

ABC requested that defendant send them audits of John Roberts and Selected Tape as of December 31, 1968.

Defendant then called his attorney Norman Gold and told him to come to Florida and sit in on the negotiations. Defendant and Gold met with Newton and another ABC executive (probably on January 7 or 8, 1969,

as Gold later testified). Negotiations ensued. "There was never any price change." ABC quoted a price of two million dollars (29,000 shares of ABC stock, then selling at about $68.50 per share).

Defendant's final meeting with ABC officials prior to the entry of the divorce decree was in New York late in January 1969. (Other testimony revealed this to be January 20th.) There had been no communication with ABC since the Florida meetings. Defendant still wanted his distributorship terminated and also wanted to further pursue negotiations concerning the possible acquisition by ABC of John Roberts and Selected Tape.

On February 4, 1969, defendant sent ABC unreviewed audits, as of December 31, 1968, and his projections for 1969, for John Roberts and Selected Tape.

Defendant had only one meeting with his wife and their respective attorneys prior to the entry of the divorce decree. This was in December 1968. Defendant had represented to his attorney, William Sampson, that his net worth was approximately $500,000. Defendant supplied Sampson with current tax returns and financial statements of John Roberts and Selected Tape. The $500,000 figure was passed on to plaintiff's attorney at the December meeting. Defendant did not take into account the potential sale to ABC in computing his net worth. "That deal could have blown apart at any given time * * *, it could have in March, in May, * * *." He never mentioned the business negotiations to his wife or Sampson.

Norman Gold was called as a witness for defendant. He is a Chicago attorney and represented defendant in the negotiations with ABC. The first contact he had with the matter was in early January (7th or 8th) 1969 when at defendant's request he flew to Florida where ABC was having a meeting. Gold testified that ABC expressed an interest in acquiring both of defendant's enterprises (John Roberts and Selected Tape) and the services of Mr. Beckerman and defendant. The meeting lasted for a little more than one-half hour. No specific discussions took place although it was clear that employment contracts were important. It was also brought out that Harry Beckerman's role was a significant one and that his acquiescence to any transaction was essential.

The next meeting took place in New York on January 20, 1969. Present at the meeting were the defendant, Gold, Beckerman, Newton and two other ABC executives. "There was discussion with respect to a stock deal * * *." The meeting lasted for an hour and one-half or two hours. It was clear that long term employment contracts would have to be worked out by the attorneys.

Gold's final contact with ABC prior to the entry of the divorce decree

was on January 28, 1969, in a telephone conversation with Larry Newton. Gold sent Newton a letter summarizing their conversation and describing certain terms upon which the parties might agree.

William Sampson testified for the defendant. He is a Chicago attorney and was hired by defendant in late October 1968 to represent him in the property settlement negotiations with plaintiff. From the information supplied to him by defendant he believed the defendant's net worth to be about $550,000. Defendant's 1967 income statement was given to Sampson. Sampson checked with Arthur Young and Company, defendant's accountant, to ascertain the net worth of defendant's interest in John Roberts and Selected Tape. On December 5, 1969, he along with the defendant, plaintiff and plaintiff's attorney met to discuss the terms of the settlement at the home of plaintiff's attorney. The figures Sampson had obtained were all passed on to plaintiff's attorney. The main terms were agreed to then. The attorneys settled on the basis that their clients each had a net worth that was within $200,000 of the other's.

Plaintiff's own testimony revealed that at the time of the divorce she had gross securities assets of $636,230 against which she owed $132,000 on a margin account with her stockbroker. At no time prior to signing the property settlement agreement, nor prior to entry of the divorce decree, was she advised of the pending negotiations between defendant and ABC.

*Testimony concerning the events* after the entry of the decree of divorce on February 11, 1969:

Defendant testified that serious negotiations with ABC did not start until after February. Defendant felt he was no closer to signing the contract in April than he was in January or early June. He learned that ABC's board of directors had approved the purchase of his holdings in mid-March 1969. The contract was signed on June 16, 1969. The closing was on August 6, 1969.[2]

Norman Gold testified that from February 1969 (after the execution of the divorce settlement) to the closing in August 1969 he had numerous conversations and meetings with Robert Downing, the Chicago attorney representing ABC. Matters that had to be resolved were the contract warranties, Securities and Exchange Commission regulations affect-

---

[2] On May 12, 1969, the assets and liabilities of John Roberts and Selected Tape were transferred to Len-Cor, a corporation. However, from January to May substantial cash withdrawals were made from the two partnerships and Len-Cor had a net worth of only $2500 as of that date. Defendant received 50.5% of the Len-Cor stock. Len-Cor was really the business entity eventually conveyed to ABC in exchange for the approximately 29,000 shares of ABC stock. Defendant thus received only 50.5% of the 29,000 shares.

ing the transaction, the employment contracts, an escrow arrangement to guarantee performance by defendant, the disposition of certain real property and leases held by defendant, the termination of Garmisa Distributing Company and the disposition of certain debts that Garmisa Distributing Company owed to ABC. Gold stated that these points were basically resolved from the beginning of April 1969 to the end of May 1969 but that some of them were not settled until the closing date, August 6, 1969.

Robert Downing, as defendant's witness, testified that he first became acquainted with the transaction on February 19, 1969, when he was asked by ABC to represent them in connection with a possible acquisition of certain companies in which the defendant had an interest. The negotiations began in the latter part of February. From the end of February until the middle of May there were disputes as to the terms of the employment agreements for both defendant and Beckerman. There was also discussion, with reference to both men, about stock options, incentive compensation plans, the possibility of geographic relocation, restrictive covenants and disability compensation. At the meetings in March the attorneys were just negotiating "the general concepts" of the contract.

Downing stated that, "During the course of the negotiations, there were various areas * * * in which I advised Mr. Gold that if he continued to insist on the position he was taking, that there could be no deal." These areas involved the scope of an investment letter that defendant was to execute,[3] representations defendant wanted ABC to make as to its financial statement, and the type and extent of the escrow arrangement ABC required in order to guarantee defendant's performance.

In the week before the contract was signed (June 16, 1969) a dispute arose over the future of ABC's relationship with Sears Roebuck, John Robert's major customer.

"ABC in this arrangement was buying * * * the futures that Mr. Garmisa and Mr. Beckerman could offer in connection with Selected Tape and John Roberts. John Robert's future was based upon a relationship with Sears Roebuck and Company. That relationship, to have

---

[3] The stock defendant was to receive was not freely marketable. Rather, it was "restricted" or "letter" stock. Defendant was required to give ABC a letter stating that his intention was to hold the ABC stock for purposes of investment rather than immediate resale. The Securities and Exchange Commission Regulations prohibit the open market sale of "letter" stock unless accompanied by an extensive registration statement. It appeared from Downing's testimony that "letter stock" may be sold on the open market without a registration statement only after it has been held by the investor for about three years.

values, should have been the subject of some agreement. We were advised that there couldn't be any written agreement. The ultimate resolution of this [in early June] * * * was a warranty by [defendant and the other signatories] that they knew of nothing which would adversely affect the relationship between John Roberts and Sears * * *."

On May 31, 1969, for the first time Downing felt that the parties had arrived at a general understanding and that the prospects of the deal going through were fairly good. Up until that time it was debatable whether the agreement would go through.

"It got to a point where every time you'd shut a door, someplace another door would open. I just had a feeling * * * that I couldn't represent to my client that we were running into normal attorney delays and that there was a good prospect that the deal would go through. I don't know if it was justified apprehension on my part, * * * and it was not until this date when I felt there was a fair meeting of the minds."

There was another matter that caused great concern until the closing. Garmisa Distributing Company, which was to be liquidated, owed ABC $272,500. This sum represented Garmisa Distributing Company's accounts payable to ABC less a credit for the value of ABC records in Garmisa Distributing Company's inventory which were to be returned to ABC. After a dispute at the closing, defendant signed a note making himself liable for the $272,500 debt. ABC undertook to collect all the outstanding accounts receivable which Garmisa Distributing Company had on its books. ABC was to act only in a clerical manner. If any dispute arose in collection of these accounts, the defendant would have to enforce them himself. Downing called an employee and an accountant of Garmisa Distributing Company to determine the nature of the accounts receivable. The list seemed to be composed of accounts over 90 days old. Any collections by ABC would go toward reducing the $272,500 debt owed to ABC.

Each party presented an expert witness to discuss the value of various assets at the time the property settlement was executed. Herbert Schelly, a certified public accountant, testified for the plaintiff. He stated that as of December 31, 1968, defendant's assets (other than his interests in John Roberts and Selected Tape) consisted of the following: $105,000 equity interest in Garmisa Distributing Company; $28,000 bank stock; $10,000 equity interest in a partnership; $30,000 equity interest in the parties' former marital home; $46,265 cash. He attributed $1,143,823 to the value of defendant's interest in John Roberts and Selected Tape

$974,640 for John Roberts and $169,183 for Selected Tape). Schelly was aware that the ABC stock defendant received was subject to an investment restriction but did not consider this in the above computations. He had heard on one occasion that such stock sells at a 15% discount.

Although the parties based their property settlement agreement on the basis of their respective net assets, the witness did not consider a $90,000 debt defendant owed to a Chicago bank, nor the conditional note for $272,500, described above, which defendant had given to ABC.

Edward Apple testified for defendant. He is a specialist in merger and acquisition work and private placing financing and private sale of blocks of stock. In his work with the brokerage firm of Freehling and Company he is in constant contact with shares of stock that are subject to investment restrictions. In answering a hypothetical question as to the value of defendant's negotiations with ABC as of February 11, 1969, he stated:

"We have too many possibilities of the deal never succeeding or never being closed and based on that, there is no way that a prudent investor or even a non-prudent investor could put a value * * * on that. It is merely conversation for all practical purposes, it is. worthless."

He stated that the ABC transaction was valueless even on June 16, 1969, when the contract was signed since ABC could still rescind if many conditions were not fulfilled. Even after ABC could no longer rescind, the stock would be worth 25% to 30% less than its open market value due to the investment restriction.

Apple stated that plaintiff's gross assets on February 11, 1969, totaled $699,836. These assets were in the form of common stock and their market values were easily ascertainable. He did not take into consideration the $132,000 that plaintiff owed on her margin account.

The potential tax liabilities of the parties were not taken into consideration by either party in computing net assets.

Based on the above testimony the court made the following findings:

4. "At the time of the negotiations between plaintiff and defendant and their respective attorneys relating to the terms of the property settlement agreement, Leonard Garmisa and Harry Beckerman were negotiating to sell interests in two partnerships in which each was a partner to American Broadcasting Companies, Inc. * * *.

5. The aforementioned negotiations continued after the Decree of Divorce was entered. The continuation of the negotiations was in good faith * * *.

7. [Plaintiff] and [Defendant] entered into the property settlement agreement of February 7, 1969, on the basis of the representation that

the net value of the assets of each was within $200,000 of the net value of the assets of the other.

8. The court cannot conclude whether the net value of the assets of [defendant] on February 7, 1969, or February 11, 1969, apart from the value of the expectancy of his and Harry Beckerman's negotiations with [ABC], was or was not within $200,000 of the net value of the assets of [plaintiff].

9. The Court finds that there was an affirmative duty on the part of the defendant to disclose the said negotiations to the plaintiff so that the plaintiff would have the same facts at her command as the defendant in negotiating a property settlement and that failure to disclose on the part of the defendant deprived the plaintiff of a material fact necessary to intelligently arrive at a property settlement, (even though said disclosure may not have affected the property settlement one way or the other, the plaintiff was entitled to make that decision) and therefore, in this sense, constituted a fraud as contemplated under the provision of Section 72 of the Civil Practice Act.

11. The Court further finds that at the time of the entry of the Decree of Divorce the plaintiff, had no income though she had assets valued at between $500,000 and $550,000, * * *.

12. The Court further finds that the Decree of Divorce heretofore entered herein and the Property Settlement Agreement incorporated therein should be modified to the sole extent that the waiver of alimony on the part of the plaintiff should be vacated, and the question of alimony * * * if any, should be reserved for future determination by the Court upon proper application by plaintiff therefore and that the said Decree of Divorce and Property Settlement shall in all other regards be held to be in full force and effect and reaffirmed."

*Opinion*

In her petition under Section 72 plaintiff alleged fraud in that various misrepresentations were made by defendant as to the value of his business interests during the time the property settlement was negotiated. The petition specifically stated that:

"Plaintiff was not aware of assets, income and estate of defendant but was relying on defendant's representations to her of the amount of his income and assets. * * * Defendant represented his interests in various companies and partnerships were of little or no value."

In his answer defendant stated that he represented his net worth to be approximately equal to that of plaintiff's within a margin of error of $200,000. In her reply plaintiff stated that:

"[Defendant's] representations that the defendant's net worth was

approximately equal to that of the plaintiff or was within a range or area of $200,000.00 is false and was false when made and states that the net worth of the defendant [*sic*], at the time of the * * * execution of the property settlement agreement and the entry of the decree for divorce was in excess of $1,500,000.00"

Since there was evidence that the parties contracted on the assumption that their respective net worths were within $200,000 of each other,[4] we may now summarize plaintiff's claim of fraud as follows: that the failure of defendant to disclose his ABC negotiations deprived her of the equal knowledge to which she was entitled in agreeing to settle their property rights; that the real value of John Roberts and Selected Tape was not their book values as used by defendant in computing his net worth for the purpose of property settlement negotiations but rather was the value of those assets in February 1969 subject to defendant's negotiations to sell the partnerships to ABC; and that if the latter figure had been used to compute defendant's net worth at the pertinent time, the figure arrived at might not have been within $200,000 of plaintiff's net worth (or, in any event, such an agreement might not have been reached).

In his cross-appeal defendant argues that even taking into consideration the value of the ABC negotiations in February 1969, his representation that their net assets were within $200,000 of each other was true; or at any rate, that plaintiff did not bear her burden of proving that this representation was false or that she suffered injury thereby; and that, therefore, the partial vacatur of the property settlement was unjustified, it being against the manifest weight of the evidence. Defendant acknowledges that the ABC negotiations were not disclosed to plaintiff prior to the entry of the divorce decree.

■■■ We would like to preface our remarks with a statement of the law governing the vacatur of decrees based on property settlements entered into by consent of the parties, as set forth in *Guyton v. Guyton*, 17 Ill.2d 439, 444, 445, 161 N.E.2d 832, 835.

"The law looks with favor upon the amicable settlement of property rights and is reluctant to disturb decrees based thereon. (*Walters v. Walters*, 409 Ill. 298.) It has long been settled that parties to a divorce suit may voluntarily adjust their property interests and the amount, if any, to be paid as alimony; and that when such agreements are made

---

[4] During oral arguments counsel for appellant made the following remarks:
No one in this record seems to know where that figure [$200,000] came from, but apparently they worked on that basis. And so, whatever happened from that point on happened on the theory that they were within $200,000 of each other in terms of assets.

a part of the decree the parties are concluded thereby. *Storey v. Storey,* 125 Ill. 608; *Buck v. Buck,* 60 Ill. 241.

A consent decree will be set aside and vacated where it has resulted from fraud or coercion by either party, and we have recently decided that inequity and unfairness in the terms of the settlement, at least where its execution has been accompanied by some element of coercion or misrepresentation, is enough to call for relief." *James v. James,* 14 Ill.2d 295.

In the cited case of *James v. James,* 14 Ill.2d 295, 305, 152 N.E.2d 582, the court noted with approval a statement from *Hamlin v. Hamlin,* 230 N.Y.S. 51, 56, to the effect that such property settlement contracts are, in theory, in furtherance of the duty incumbent upon a husband to support a wife.

■■ We believe that under the guidelines set forth in *Guyton* and *James* defendant was under an obligation to disclose the fact that preliminary negotiations had taken place with ABC for the sale of John Roberts and Selected Tape. By the time the decree was entered defendant had met several times with ABC officials in serious negotiations. On January 2 or 3, 1969, defendant met with ABC officials in Florida. These discussions reached such a degree of specificity that defendant felt obliged to call his attorney and request that he join in them. A subsequent meeting in Florida took place on January 7 or 8, 1969. On January 20 defendant again met with ABC officials, this time at the ABC corporate headquarters in New York. Accompanying the defendant at this meeting were his attorney and his business partner. These Florida and New York discussions involved far more than the casual comments made to the defendant when he first went to New York in October 1968, and defendant's negotiations with ABC should have been disclosed to plaintiff.

■■ The non-disclosure in the instant case was in essence a misrepresentation as to the value of defendant's interests in the two partnerships. In order for a misrepresentation to constitute fraud, in addition to other elements not relevant here, the complaining party (plaintiff) must show that it was false and that she relied on it to her injury. (*Broberg v. Mann,* 66 Ill.App.2d 134, 139, 213 N.E.2d 89.) Fraud must be proven by clear and convincing evidence. *Wilson v. Wilson,* 56 Ill.App.2d 187, 194, 205 N.E.2d 636.

The trial court conducted full and extensive hearings about the parties' financial conditions. The court found that it could not tell whether apart from the ABC "expectancy" the net worths of the parties were within $200,000 of each other. (See Finding No. 8, *supra.*) In its oral opinion

424

the court stated that it was also unable to evaluate the ABC transaction; the deal had "too many contingencies." The court concluded that the decree should be modified by vacating plaintiff's waiver of alimony. As we shall point out, this conclusion to modify the decree in this manner was against the manifest weight of the evidence.

Plaintiff's expert, Herbert Schelly, listed defendant's assets (other than his partnership interests in John Roberts and Selected Tape) as follows: $105,000, the value of defendant's interest in Garmisa Distributing Company; $28,000 bank stock; $10,000 equity interest in a partnership; $30,000 equity interest in the parties' former marital home; $46,265 cash. This totals $219,265. Schelly did not take into consideration a $90,000 debt defendant owed to a Chicago bank. This reduces defendant's non-partnership net assets to $129,265. (Schelly also failed to consider the $272,500 note to ABC on which defendant was personally liable subject to the contingency of receivable collections as described above.)

Schelly attributed $1,143,823 to defendant's interest in John Roberts and Selected Tape. Schelly reached this figure by adding defendant's book value interests in John Roberts and Selected Tape (totaling $133,-823) which, as defendant testified, were "zeroed out" by the time the partnership assets and liabilities were transferred to Len-Cor Corporation.

■■ It is clear that the investment restriction that was placed on defendant's stock was not properly taken into consideration in arriving at the $1,010,000 figure. Defendant's expert witness, Edward Apple, was the only witness having personal experience in dealing with restricted stock. He testified that the ABC stock with the restriction on the right to sell would be worth 25% to 30% less than the unrestricted market value of such stock. Discounting the value of the ABC stock defendant was to receive at 25%, one arrives at a figure of $757,500; using 30% the figure becomes $707,000. We consider this range of $707,000 to $757,500 to be the security value appropriate to plaintiff's theory, and thus John Roberts and Selected Tape would have a total value of $840,823 to $891,323 ($133,823 plus $707,000 to $757,500).

Plaintiff testified that all her assets were in the form of common stock worth about $636,230 in early February 1969. Defendant's expert, Edward Apple, stated that the fair market value of plaintiff's portfolio on February 11, 1969, was $699,836.88.[5] She owed $132,000 on her margin account with her stockbroker, leaving her net assets at $504,230 or $567,836.88.

---

[5] It is undisputed, and the trial court so found, that neither party took into account his or her potential tax liabilities upon the sale of stock when determining net worth.

Under plaintiff's hindsight theory of evaluating defendant's assets, there would be $129,265 for his non-partnership assets to be added to a range of $840,823 to $891,323 for the partnership interests. This would produce a total range for defendant of $970,088 to $1,020,588.

Edward Apple testified that the appropriate valuation for John Roberts and Selected Tape as of the date of divorce was their book values or $133,823 since the ABC transaction had too many contingencies attached to it; he called it "worthless." Thus, under defendant's theory his net worth would be $263,088 ($129,265 plus $133,823), although there was also the testimony of William Sampson, the attorney representing defendant in the property settlement negotiations, that based upon the information given him, he believed that defendant's net worth approximated $550,000.

The court properly found that the parties' settlement was made on the basis of an estimated difference of $200,000. (See Finding No. 7 *supra.*) As set forth, *supra,* the trial court had a testimonial range from $263,088 to $1,020,588 for evaluating defendant's net assets.

This top figure does not take into consideration the fact that by February 11, 1969, the ABC transaction was still only in the stage of preliminary negotiations. The potential deal was only an "expectancy," as the court below labeled it in Finding No. 8, *supra.* The following undisputed evidence shows that the contract could hardly have been considered finalized as of February 1969: (1) there is no evidence that the large customers of John Roberts and Selected Tape had in any manner indicated their consent, which was an essential prerequisite to the transaction; in fact, with respect to John Roberts, ABC was trying to obtain, as late as June 1969, some type of written assurance from Sears Roebuck that it would deal with ABC as it had with John Roberts; (2) Harry Beckerman, defendant's partner and the instrumental figure in Selected Tape's operations, did not enter the negotiations until January 20, 1969, a short time before the divorce decree was entered; Beckerman's acquiescence was essential and of extreme importance in valuing the entire transaction; (3) ABC did not contact Robert Downing, the Chicago attorney it employed to represent it in the negotiations, until February 18, 1969, a week after the decree was entered; only thereafter did Downing meet with defendant's attorney to bargain over the substantive contract provisions; Downing testified that there were times in April and May that it was dubious that the contract would go through; and (4) lengthy employment contracts for both defendant and Harry Beckerman had to be negotiated since it is clear that ABC was essentially purchasing the contacts and experience of the two men; the substance of these con-

tracts, the numerous technical provisions therein, was discussed only in a cursory manner prior to the entry of the divorce decree.[6]

Neither does the top figure take into consideration the potential liability of defendant on the note for $272,500 which he was required to give to ABC.

■■ We repeat that plaintiff bore the burden of proving by clear and convincing evidence that the non-disclosure of the ABC negotiations resulted in her injury. This burden is made even more onerous in the instant case by the fact that when a party seeks to vacate or modify a property settlement incorporated in a divorce decree, all presumptions are in favor of the validity of the settlement. *Bickson v. Bickson,* 35 Ill.App.2d 360, 183 N.E.2d 16 (abst.).

The trial court could not determine whether the net value of defendant's assets on February 7 or 11, 1969, apart from the value of the "expectancy" of defendant's and Beckerman's negotiations with ABC was or was not within $200,000 of the net value of the assets of plaintiff. Furthermore, as we noted earlier, the court in its oral opinion stated that it was unable to evaluate the ABC transaction; the deal had too many contingencies. In short, the court could not determine, and accordingly, plaintiff failed to bear her burden of clearly showing, that defendant's net assets as of February 11, 1969, were not within $200,000 of plaintiff's.

■■ We conclude, therefore, that the parties must be held to their bargain, and that the trial court was without justification in modifying the degree to permit rescission of plaintiff's waiver of alimony.

■■ Finally, we must consider plaintiff's contention that, as a matter of law, she was subject to duress when she executed the property settlement.

In *Kaplan v. Kaplan,* 25 Ill.2d 181, 186, 182 N.E.2d 706, 709, the following standards were set forth:

> Any wrongful threat which actually puts the victim in such fear as to act against his will constitutes duress * * *. Generally, as stated in 17A Am. Jur., Duress and Undue Influence, sec. 11, p. 573, "the threat must be of such nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and *must have that effect, and the act sought to be*

---

[6] We might note that under the final contract with ABC, defendant was initially to receive only 90% of his share of the ABC stock, the remaining 10% being placed in an escrow account to insure defendants performance of the contract. This is an additional factor which would tend to reduce the gross value of the ABC contract to plaintiff even if we assume, as did plaintiff for the purpose of valuation, that it had been finalized in February 1969.

*avoided must be performed by the person while in that condition
\* \* \*."* (Emphasis added.)

Plaintiff testified that the defendant had a violent temper and on several occasions during the two year marriage requested a divorce. On one occasion a trip to Acapulco about one year before the settlement agreement was executed, plaintiff overheard defendant tell a third party that he was going to have her kneecaps broken. On cross-examination she stated, "I really didn't think he would have my kneecaps broken \* \* \*. I told you I didn't think he would do that." Plaintiff also stated that there was great tension between them while they lived together. However, it is undisputed that defendant never saw plaintiff during the month and one-half before the settlement agreement was executed, that at all stages of the negotiations she was represented by an experienced divorce attorney, and that the agreement was executed in the comfort of her attorney's home at which time defendant was not present.

There is sufficient evidence to support the court's finding that plaintiff was not under duress at the time she executed the settlement agreement.

In conclusion, the decree modifying the original decree of divorce is reversed.

Decree reversed.

ENGLISH and STAMOS, JJ., concur.